# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**TINA MONROE,**
**Plaintiff,**

v.

**Civil Action No. 1:14cv48**
**(The Honorable Irene M. Keeley)**

**COMMISSIONER OF SOCIAL SECURITY,**
**Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Tina Monroe ("Plaintiff") brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Defendant," and sometimes "Commissioner") denying her claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

## I. Procedural History

On April 28 and 30, 2011, Plaintiff filed applications for DIB and SSI, alleging disability since April 1, 2011, due to depression, post traumatic stress disorder ("PTSD"), anxiety, transverse myelitis, and high blood pressure (R. 9, 139-43, 197). Plaintiff's applications were denied initially and upon reconsideration (R. 67-70). On November 30, 2012, Administrative Law Judge ("ALJ") Jeffrey LaVicka conducted a hearing, at which Plaintiff, represented by a non-attorney representative, and Vocational Expert ("VE") Larry Ostrowski testified (R. 29-66). On December 5, 2012, the ALJ entered a decision, finding Plaintiff was not disabled (R. 9-23). On January 23, 2014, the Appeals

Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the commissioner (R. 1-4).

## II. Statement of Facts

Plaintiff was born on July 13, 1973, and was thirty-nine (39) years old at the time of the administrative hearing. She had a high school education (R. 22). Plaintiff had past relevant work as a tax preparer, human resource worker in retail, housekeeper, customer service at a call center, desk clerk at a hotel, and a self-employed knitter (R. 121).

Board Certified Advanced Practice Registered Nurse ("APRN") Francis Cuda treated Plaintiff for hypertension, depression, anxiety, and chronic back pain starting on July 28, 2009. Throughout 2009, APRN Cuda prescribed Lorcet.

On January 4, 2010, APRN Cuda prescribed Lorcet to Plaintiff; on January 22, 2010, prescribed Klonopin to Plaintiff; on February 1, 2010, prescribed Lorcet to Plaintiff; and on February 25, 2010, prescribed Ziac and Celexa to Plaintiff (R. 237).

Plaintiff complained of depression and being "achy" on March 1, 2010, to APRN Cuda, who diagnosed depression, hypertension, anxiety, and chronic back strain. APRN Cuda prescribed Lorcet and Klonopin (R. 236).

APRN Cuda prescribed Lorcet to Plaintiff on June 7, 2010; prescribed Lorcet to Plaintiff on July 1, 2010; and prescribed Celexa to Plaintiff on July 8, 2010 (R. 236).

APRN Cuda examined Plaintiff on July 22, 2010, and noted Plaintiff had a slight limp on her left side. APRN prescribed Celexa, Ziac, and Lorcet and noted Plaintiff had Klonopin. APRN Cuda instructed Plaintiff to return in four (4) months (R. 236).

Plaintiff presented to APRN Cuda on November 22, 2010, with complaints of "startling and

legs moving," which disturbed her sleep. Plaintiff's blood pressure was 124/80. Her examination was normal; however, Plaintiff had a "slight" limp. Her gait and stance were normal. APRN Cuda diagnosed acute sinusitis and bronchitis, anxiety disorder, and restless leg syndrome. APRN Cuda prescribed Klonopin and Requip (R. 248).

APRN Cuda examined Plaintiff on March 22, 2011. He noted Plaintiff medicated with Hydrocodone, Klonopin, and Requip. Plaintiff reported she was "doing well on current regieme (sic) of meds." Plaintiff's blood pressure was 130/82. Her examination was normal. APRN Cuda diagnosed benign essential hypertension, depression, and generalized anxiety. He prescribed Klonopin and Celexa and instructed Plaintiff to return in four (4) months (R. 246).

Plaintiff presented to APRN Cuda with a request that he complete a "DHHR PE for disability" form on April 25, 2011. Plaintiff's blood pressure was 140/100. APRN Cuda noted Plaintiff's active problems were benign hypertension and depressive disorder (R. 243). Plaintiff's right calf was smaller than her left. The rest of her examination was normal. APRN Cuda diagnosed benign essential hypertension, PTSD, and muscular dystrophy (R. 244).

APRN Cuda completed a West Virginia Department of Health and Human Resources Medical Review Team (MRT) General Physical (Adults) form for Plaintiff on April 25, 2011 (R. 239, 241). APRN Cuda wrote he had treated Plaintiff for depression, post polio syndrome, and hypertension and Plaintiff's disabilities included PTSD, depression, and right leg muscle wasting. Plaintiff limped on her right side. Her blood pressure was 140/100 (R. 239). Plaintiff's examination was normal except as follows: her right calf was smaller than her left calf and had reduced sensation. Her affect was flat. APRN Cuda wrote Plaintiff experienced weakness and pain in her right leg when she walked. APRN Cuda opined Plaintiff could not work full time because she was

"processing sexual abuse in childhood - emotional lability." APRN Cuda wrote that, if Plaintiff were to work, she should avoid prolonged walking or standing and stress because she needed counseling (R. 240). APRN Cuda recommended a neurology consultation for Plaintiff's muscle wasting and psychiatric counseling. APRN Cuda's conclusion was Plaintiff needed "to process PTSD of sexual abuse(;) [right] leg weak & painful all the time - permanent muscle wasting" (R. 241).

Sharon Joseph, Ph.D., completed a Psychological Evaluation of Plaintiff on April 29, 2011, upon referral by the Randolph County Department of Health and Human Resources because Plaintiff was applying for Medicaid. Plaintiff reported her parents were living, she was the older of two (2) children, she was divorced, she had an eleven (11) year old child who lived with its father, and she lived alone. Plaintiff began working in 1989, and her last job was in January, 2009, which she lost because she was "laid off." She had not worked since that time (R. 255).

Plaintiff reported she had been hospitalized when she was nine (9) years old for pneumonia, fourteen (14) years old for transverse myelitis and paralysis, and twenty-six (26) years old for childbirth. Plaintiff reported she experienced stiffness, pain, depression, anxiety, and high blood pressure. She medicated with Biosoporol, Celexa, Klonopin, and Hydrocodone. Plaintiff smoked one (1) package of cigarettes per day. Plaintiff reported she no longer drank alcohol, and she had not used illegal drugs since July, 2005. In July, 2005, Plaintiff was arrested "for a meth lab conspiracy." Plaintiff stated she was in the house of the person who was manufacturing methamphetamine. She served six (6) months in prison and was on supervised release for five (5) years (R. 256).

Dr. Joseph observed no "obvious" physical limitations. Plaintiff was alert and oriented. She was cooperative. Dr. Joseph noted Plaintiff's mood "appear[ed] depressed and anxious." Plaintiff

4

reported she had experienced suicidal ideations "without intent or plan." She did not experience homicidal ideations, perceptional or thinking disturbances, or delusions. She had no preoccupations, obsessions, or compulsions (R. 256). Dr. Joseph noted Plaintiff's motor activity was nervous, her posture was appropriate, and she had average eye contact. Plaintiff language usage was average, speaking was normal, and content was relevant. Dr. Joseph found Plaintiff had no psychomotor disturbances. Her affective expression was found to be anxious; her insight was adequate. Dr. Joseph found Plaintiff's immediate memory was within normal limits; her recent memory was mildly impaired; her remote memory was within normal limits. Plaintiff's concentration was found to be normal. Plaintiff's judgment was found to be normal (R. 257).

Plaintiff scored the following on the Wechsler Adult Intelligence Scale-IV (WAIS-IV): verbal comprehension index was ninety-eight (98); perceptual reasoning was ninety (90); working memory index was eight-nine (89); processing speed index was seventy-one (71); and her full scale IQ was eighty-five (85), placing her in the low average range of intellectual functioning. Plaintiff scored grade twelve (12), nine (9) months in word reading, sentence comprehension, spelling, math computation, and reading composite subtests on the Wide Range Achievement Test-4 (WRAT-4) (R. 257). On the Millon Clinical Multiaxial Inventory III (MCMI-III), Plaintiff's results showed elevations on the major depression scale, borderline personality scale, and the anxiety and somatoform scales (R. 258).

Plaintiff listed her activities of daily living as follows: woke at noon or 1:00 p.m.; she didn't "do much of anything"; she "just sits and thinks and is upset" during the afternoon; and retired between 11:00 p.m. and midnight. Plaintiff woke five (5) or six (6) times per night. Plaintiff reported she was able to wash dishes, dust, clean the bathroom, put away groceries, go up and down

stairs, take out the garbage, walk to the mailbox, go grocery shopping, and drive a car. She was able to remember to turn off the stove. As to socialization, Plaintiff reported she had a boyfriend, with whom she spent time. She spent time with her parents. She liked to read. Dr. Joseph found her socialization was normal (R. 258).

Dr. Joseph's diagnostic impression was as follows: Axis I - major depression, recurrent and moderate, and anxiety disorder; Axis II - "R/O" personality disorder with borderline features; Axis III - medical issues; Axis IV - psychosocial stressors that were moderate; and Axis V - GAF of sixty (60) (R. 258). Dr. Joseph found Plaintiff's psychological prognosis was "fair." Dr. Joseph recommended Plaintiff undergo a consultation with a psychiatrist relative to her mental health medications and participate in individual psychotherapy. Dr. Joseph opined Plaintiff's current medications did "not appear [to be] helping . . . a great degree" (R. 259).

Dr. Lauderman completed a Physical Residual Functional Capacity Assessment of Plaintiff on June 23, 2011. He found Plaintiff could occasionally lift and/or carry twenty (20) pounds; frequently lift and/or carry ten (10) pounds; stand and/or walk and sit for a total of about six (6) hours in an eight (8) hour workday; and push/pull on an unlimited basis (R. 276). Dr. Lauderman found Plaintiff could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. He found Plaintiff could never climb ropes, ladders, or scaffolds (R. 277). Dr. Lauderman found Plaintiff had no manipulative, visual, or communicative limitations (R. 278-79). Dr. Lauderman found Plaintiff was unlimited in her exposure to wetness, humidity, noise, fumes, odors, dusts, gases, and poor ventilation; she should avoid concentrated exposure to extreme cold and heat and vibration; she should avoid all exposure to hazards (R. 279).

Dr. Suansilppongse completed a Psychiatric Review Technique of Plaintiff on July 1, 2011. Dr. Suansilppongse found Plaintiff had an affective disorder (R. 283). Plaintiff's affective disorder

6

was mood disorder, not otherwise specified, "r/o major depression" (R. 286). Dr. Suansilppongse found Plaintiff had mild limitations in her activities of daily living and social functioning. Dr. Suansilppongse found Plaintiff had moderate limitations in maintaining concentration, persistence, or pace (R. 293).

Dr. Suansilppongse also completed a Mental Functional Capacity Assessment of Plaintiff on July 1, 2011. In the "Understanding and Memory" category, Dr. Suansilppongse found Plaintiff was not significantly limited in her ability to remember locations and work-like procedures and understand and remember very short and simple instructions. Plaintiff, according to Dr. Suansilppongse, was moderately limited in her ability to understand and remember detailed instructions. In the "Sustained Concentration and Persistence" category, Dr. Suansilppongse found Plaintiff was not significantly limited in her abilities to carry out very short and simple instructions, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted by them, and make simple, work related decisions (R. 301). Dr. Suansilppongse found Plaintiff was moderately limited in her abilities to carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods (R. 301-02). Dr. Suansilppongse found Plaintiff was not significantly limited in any ability listed in the "Social Interaction" category. In the "Adaptation" category, Dr. Suansilppongse found Plaintiff was not significantly limited in her abilities to be aware of normal hazards and take appropriate precautions, travel in unfamiliar places, or use public transportation. Dr. Suansilppongse found Plaintiff was

moderately limited in her abilities to respond appropriately to changes in the work setting, set realistic goals, or make plans independently of others (R. 302). Dr. Suansilppongse concluded as follows:

> The claimant is able to understand and remember simple instructions. The claimant is able to carry out simple instructions. Her ability for sustained concentration and persistence or for task completion would be minimally limited due to anxiety and depressive reaction, and alleged pain. Her ability for appropriate interaction with supervisors, coworkers or the public would not be significantly limited. Her ability in a routine work setting would be . . . minimally limited due to anxiety and depressive reaction.
>
> The psychiatric impairment severity does not meet or equal any Listing. The claimant has mental capacity for simple work related activity with minimal limitation due to alleged pain. Diagnosis: Mood Disorder NOS r/o Major Depression. The claimant's allegations are supported by MER.
>
> The psychological evaluation report dated 04/29/10 (sic) contains brief descriptions of claimant's functional capacity. The author seems to under estimate her functional ability and clinical response with treatment by a primary care physician. The MSS has been considered with other evidence and given applicable weight (R. 303).

Plaintiff presented to APRN Cuda on July 26, 2011, with complaints of weight loss. She weighed one-hundred and two (102) pounds, twenty-eight (28) pounds less than a year earlier. Plaintiff's blood pressure was 100/70. APRN Cuda noted Plaintiff was oriented, well developed, well nourished, and in no acute distress (R. 305). Except for a limp on her right side, Plaintiff's examination was normal. APRN Cuda assessed moderate, recurrent major depression and weight loss (R. 306). APRN Cuda prescribed Klonopin, Celexa, and Hydrocodone. He ordered blood work. He counseled Plaintiff to stop smoking (R. 307).

On August 25, 2011, Plaintiff's non-attorney representative provided a Function Report - Adult to Social Security Disability Determination Services. Plaintiff noted the following activities of daily living: woke at noon, lay on the couch, took care of her personal needs, showered twice a

week due to lack of motivation and difficulty standing in the shower due to pain, wore hair in pony tail because she lacked motivation to style it, dressed, lay down due to pain, had difficulty putting on her shoes due to pain, snacked throughout the day because she lacked motivation to eat, only washed dishes every few days due to leg pain and fatigue, cared for her cat, napped throughout the day, had difficulty sleeping due to racing thoughts, read books and magazines with difficulty focusing and poor concentration, tried not to worry about things, retired at 10:00 p.m., had difficulty falling asleep and staying asleep due to anxiety and racing thoughts (R. 309).

Plaintiff reported her boyfriend helped her care for her cat (R. 309). Prior to her illness, Plaintiff could complete her daily activities without resting and read "for hours a day." She used to watch movies, swim, go out to dinner, and garden. Plaintiff could no longer do these activities due to poor concentration, fatigue, poor balance, leg numbness and pain, weakness, and depression. Plaintiff noted she did not need special help or reminders to care for her personal needs (R. 310). She prepared only simple meals due to difficulty standing, depression, and pain and numbness in her leg and foot. She had difficulty lifting pots and pans and reaching due to poor balance, weakness, fatigue, and leg swelling and numbness. It took Plaintiff ten (10) minutes to wash dishes because she had difficulty standing. She would "pick up things around the house a few times a week for 10 minutes." Her boyfriend helped her clean. She left her house no more than a few times per month due to anxiety and depression (R. 311). Plaintiff experienced pain when she drove a car. She drove only short distances because sitting caused stiffness. Her boyfriend shopped because she became anxious when she shopped due to "lack of income and difficulty affording things." Plaintiff managed her own money. She spent time with her boyfriend on a daily basis (R. 312). Plaintiff reported she was limited in her ability to lift, walk, climb stairs, and stand for long periods due to

pain, numbness, swelling, and tingling in her right leg and foot, poor balance, weakness, and fatigue. Plaintiff had difficulty squatting and kneeling due to pain, numbness and tingling in her right leg and foot, poor balance, and fatigue. Plaintiff had difficulty bending and reaching due to poor balance. Plaintiff had difficulty staying focused on conversations (R. 313). She had short-term memory loss. It took her longer to complete tasks because she moved slowly and had to rest due to pain, numbness, swelling, and tingling in her right leg and foot, poor balance, weakness, fatigue, and lack of motivation. Plaintiff had difficulty concentrating, understanding, and following verbal and written instructions. She could walk for five-to-ten (5-10) minutes before she needed to rest for five (5) minutes. She could pay attention for ten (10) minutes before she lost focus. She did not "handle" stress or changes in routine well due to anxiety and depression (R. 314). She was paranoid and untrusting of others. She wore a brace/splint and an "elastic brace around" her right ankle and foot during sleep. Plaintiff experienced no side effects to her medications (R. 315).

Marla Corley, of the Appalachian Community Health Center, completed an "Intake Summary" of Plaintiff on September 1, 2011. Plaintiff was "a self-referral . . . for outpatient therapy and psychiatric services." Plaintiff reported her twelve (12) year old son lived with his father. She had had a "very bad summer." Her ex-husband had kept "her son from her." Plaintiff reported she had experienced depression since the age of fourteen (14) when she had an autoimmune disorder which caused paralysis. She was ridiculed by other children because of that. Plaintiff stated that she had medicated with several types of antidepressants over the years and none alleviated her problems; however, Lexapro had worked "the best" but she could not afford to pay for the medication. Plaintiff felt hopeless, had crying episodes, was irritable, experienced mood swings, had suicidal thoughts, had no motivation, had low self esteem and self worth, and had isolated herself. Plaintiff stated she

had moved out of her apartment in July because she was four (4) months behind in paying her rent, her car had broken down, her bicycle was her transportation until it was stolen, she had not unpacked her belongings, and she was staying with a friend (R. 344).

Plaintiff reported that her father had been "sexually inappropriate with her when she was 16 years old and it happened a couple of times." Her father would not admit that his actions were wrong and that made her angry. She did not trust others and she was suspicious (R. 344). Plaintiff experienced social anxiety and she felt people "stare[d]" at her. She was afraid to go out in public; she was impulsive; her thoughts raced (R. 345).

Plaintiff reported she had a poor childhood. Her father had been sexually inappropriate with her; her mother withdrew from Plaintiff when Plaintiff told her. She had been married and divorced three (3) times. She graduated high school. Plaintiff was on probation for a conspiracy conviction. She was unemployed and felt she was unable to work. Plaintiff had not been hospitalized for mental illness or substance abuse. Plaintiff had applied for disability benefits (R. 345).

Ms. Corley observed that Plaintiff's appearance was appropriate; she had good eye contact during the intake; she walked with a limp; she had a good appetite; she had lost twenty-five (25) pounds; her energy was low; she had suicidal thoughts; her affect was blunted; her mood was tangential; she was easily distracted; she had difficulty concentrating; she was well oriented (R. 345). Ms. Corley found Plaintiff was positive for depression and anxiety, which affected her social interpersonal relationships and her ability to maintain employment. It was noted that Plaintiff exhibited borderline personality traits. This diagnosis needed to be ruled out. Ms. Corley assessed the following: Axis I - major depressive disorder, recurrent and moderate, and anxiety disorder, not otherwise specified; Axis IV - unemployed; and Axis V - GAF of fifty-six (56). Ms. Corley found

Plaintiff required service coordination, individual and group behavioral health counseling, psychiatric examination, pharmacological management, medication, and functional assessments. Plaintiff made an appointment for group therapy for September 8, 2011 (R. 346).

Debra Lilly, Ph.D., completed a Psychiatric Review Technique of Plaintiff on September 5, 2011. Dr. Lilly found Plaintiff was positive for affective disorder, specifically she had depressive syndrome which was characterized by anhedonia or pervasive loss of interest in almost all activities; appetite disturbances with weight change; sleep disturbances; and decreased energy (R. 318, 321). Dr. Lilly found Plaintiff had mild limitations in her activities of daily living and ability to maintain social functioning. She had moderate limitations in maintaining concentration, persistence, and pace. She had experienced no episodes of decompensation (R. 328). Dr. Lilly found the following:

> The claimant is considered to have limited credibility with regard to the severity of her symptoms and the difficulty in functioning. Her treating source makes no mention of an increase in symptoms and notes that she is not in any acute distress. She continues to live alone, but has a boyfriend. Social isolation is not credible. She seeks no professional assistance but continues to attend with family practice nurse practitioner who also makes no referral. The claimant may have some limitations in perssistence (sic) as she alleges she has limited motivation, but CE finds no disturbance in concentration. Scores on coding and symbol search suggest this also (R. 330).

Dr. Lilly also completed a Mental Residual Functional Capacity Assessment on September 5, 2011. In the "Understanding and Memory" category, Dr. Lilly found Plaintiff was not significantly limited in her ability to remember locations and work-like procedures , understand and remember very short and simple instructions, and understand and remember detailed instructions. In the "Sustained Concentration and Persistence" category, Dr. Lilly found Plaintiff was not significantly limited in her abilities to carry out very short and simple instructions, carry out detailed instructions, maintain attention and concentration for extended periods, sustain an ordinary routine

without special supervision, work in coordination with or proximity to others without being distracted by then, and make simple, work related decisions (R. 332). Dr. Lilly found Plaintiff was moderately limited in her abilities to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods (R. 332-33). Dr. Lilly found Plaintiff was not significantly limited in any ability listed in the "Social Interaction" or "Adaptation" categories (R. 333). Dr. Lilly found Plaintiff "retain[ed] the ability to learn, recall, and perform a variety of work-like activities in settings that do not have a high production demand" (R. 334).

Dr. Lim completed a Physical Residual Functional Capacity Assessment of Plaintiff on September 9, 2011. Dr. Lim found Plaintiff could occasionally lift and/or carry twenty (20) pounds; frequently lift and/or carry ten (10) pounds; stand and/or walk and sit for about six (6) hours in an eight (8) hour workday; and push/pull unlimited (R. 337). Dr. Lim found Plaintiff was occasionally limited in her ability to climb ramps and stairs, balance, stoop, kneel, couch, and crawl. Plaintiff should never climb ladders, ropes, or scaffolds (R. 338). Dr. Lim found Plaintiff had no manipulative, visual, or communicative limitations (R. 339-40). Dr. Lim found Plaintiff should avoid concentrated exposure to extreme cold and vibration; should avoid all exposure to hazards; and had unlimited exposure to extreme heat, wetness, humidity, noise, fumes, odors, dusts, gases, and poor ventilation (R. 340). Dr. Lim found Plaintiff was "not fully credible." Plaintiff's gait and station were normal. Her activities of daily living were normal. She walked without ambulatory aids. Her weight loss was not organic (R. 343).

Plaintiff's medications were evaluated at the Appalachian Community Health Center on

October 19, 2011. Plaintiff reported she stopped medicating with Lamictal because it made her feel "stiff." Plaintiff "did well on Lexapro in the past and want[ed] to start [it] again." Plaintiff's mood was downcast; her affect was anxious. She was prescribed Lexapro (R. 348).

Plaintiff presented to APRN Cuda on December 2, 2011, with complaints of elevated blood pressure; Plaintiff was not taking her prescribed Ziac. Plaintiff informed APRN Cuda she still participated in counseling for PTSD and she had an appointment with a neurologist for muscle weakness and leg pain. Plaintiff's blood pressure was 150/90 (R. 353). Her examination was normal (R. 353-54). APRN Cuda diagnosed moderate, recurrent major depression. He ordered laboratory tests for hypothyroidism, instructed Plaintiff to return in six (6) weeks for depression, and prescribed Ziac for hypertension (R. 355).

APRN Cuda completed a "Physical Capacities Evaluation" of Plaintiff on December 2, 2011. He found Plaintiff could sit, stand, and/or walk for one (1) hour in an eight (8) hour workday and she needed to alternate between standing and sitting at will. APRN Cuda found Plaintiff had no manipulative limitations. He found Plaintiff could not use her feet to operate pedals (R. 349). APRN Cuda found Plaintiff could occasionally lift and/or carry up to five (5) pounds in an eight (8) hour workday and could never lift and/or carry six (6) to one-hundred (100) pounds in an eight (8) hour workday. APRN Cuda found Plaintiff could occasionally climb, balance, crawl, and reach above shoulder level in an eight (8) hour workday and could never stoop, kneel, or crouch in an eight (8) hour workday. APRN Cuda found Plaintiff was totally restricted from activities involving unprotected heights; she was moderately restricted in activities involving moving machinery, marked changes in temperature and humidity, and exposure to dust, fumes, and gases; and she was mildly restricted in activities involving driving automotive equipment (R. 350). APRN Cuda found

Plaintiff's pain was caused by transverse myelitis and prevented her from being employed on a full-time basis (R. 351). APRN Cuda further found that Plaintiff had been diagnosed with PTSD and stress; she was fatigued; and fatigue prevented her from working full time (R. 352).

Dr. Rahman completed an evaluation of Plaintiff on December 8, 2011, for pain, numbness, and weakness in her right leg; Plaintiff was self referred. Plaintiff reported she had been hospitalized in 1987 for two (2) weeks for right leg pain, weakness, and numbness. She had been "suspected" of having transverse myelitis (R. 357). Dr. Rahman opined the "etiology was uncertain" and needed "to be considered" (R. 358). When she was released from the hospital, she underwent physical therapy. She continued to experience weakness, pain, numbness, and tingling in her right leg. Plaintiff reported that, in addition to transverse myelitis, she had been diagnosed with anxiety, depression, hypothyroidism, fatigue, headaches, and spasm. Plaintiff informed Dr. Rahman that she medicated with Hydrocodone, Clonazepam, Lexapro, Ibuprofen, and Depo-Provera. She was not employed and she "came for social security insurance." Plaintiff smoked one (1) package of cigarettes per day and occasionally drank alcohol (R. 357).

Plaintiff's chief complaints were dry eyes, sore mouth, wheezing, chest pain, hypertension, leg swelling, and no sex drive. Plaintiff denied suicidal thoughts. Upon examination, Dr. Rahman noted Plaintiff's blood pressure was 150/102. Plaintiff's neck was supple; her speech was fluent; her skin, cardiac, neurological, chest, and abdominal examinations were normal. Plaintiff's motor examination showed normal muscle tone and bulk; she had mild atrophy. As to strength, Plaintiff had weakness of the right leg, hip flexion/extension, abduction/aduction, and knee flexion/extension. The strength in her left leg and both arms was normal. Plaintiff's deep tendon reflexes were bilaterally active; her right leg was hyperactive. Plaintiff's sensory test showed "thoracic 10 on the

right." Plaintiff's finger-to-nose coordination test was normal. Plaintiff's gait was positive for a limp; she had difficulty walking on tiptoes, walking on heels, and walking tandem (R. 358).

Dr. Rahman found that transverse myelitis, viral infection, polio, vascular disease, and lupus needed to be investigated. Dr. Rahman noted Plaintiff was taking medication for depression, her thyroid function test was not available, and she treated her hypertension with Ziac (R. 359).

A Pharmacological Management report was completed on Plaintiff at the Appalachian Community Health Center on December 12, 2011. Plaintiff reported that Dr. Rahman had prescribed Neurontin and APRN Cuda order laboratory work to rule out a diagnosis of hypothyroidism. She was "pleased to have a team working with her." Plaintiff stated she was "down" on some days, but felt "a lot better than before." Plaintiff had no significant complaints; she requested her medication dosage be increased. It was noted Plaintiff was pleasant and cooperative. He mood was "slightly down cast (sic)," and her affect was anxious (R. 364). Plaintiff's appearance was neat, speech was coherent, affect was constricted, mood was anxious, attitude was friendly, and appetite was good. Plaintiff stated she was "overeating" due to her thyroid. Plaintiff made good eye contact and she had good rapport with the examiner (R. 365). Plaintiff stated her energy level was satisfactory; she had no suicidal or homicidal ideations; she had no delusions, hallucinations, or illusions (R. 366). Her cognitive functions were intact; her intelligence was average; her recent and remote memories were intact; she was alert and oriented, times three (3); she was not disoriented or confused; her insight and judgment were good (R. 367). Plaintiff was diagnosed with major depressive disorder, recurrent, and anxiety, not otherwise specified. Her GAF was fifty-five (55) (R. 368). Plaintiff's prescription of Lexapro was continued (R. 369).

Plaintiff presented to Dr. Rahman on March 20, 2012, with complaints of worsening leg pain

and numbness. Plaintiff stated her stress was "worse" and she was "more nervous." Gabapentin was "not really helping" her. She had a headache. Plaintiff medicated with Clonazepam, Hydrocodone, Ibuprofen, Ziac, and Gabapentin. Her blood pressure was 183/109 and she had right leg numbness. Dr. Rahman diagnosed anxiety, depression, and transverse myelitis (R. 360-61).

Carolyn Donovan, Doctor of Nursing Practice ("DNP"), Psychiatric-Mental Health Clinical Nurse Specialist ("PMHCNS-BC"), Family Nurse Practitioner ("FNP-C"), of the Appalachian Community Health Center, conducted a psychiatric follow-up examination of Plaintiff on March 29, 2012. DNP Donovan noted Plaintiff medicated with Neurontin, Klonopin, Hydrocodone and had recently discontinued Lexapro. Plaintiff reported she had been "unable to make her appointments this summer because of a variety of issues that she has had at home." Plaintiff felt "angry, irritable and tearful." She had not medicated with Lexapro for one (1) month. Plaintiff "seem[ed] to be at odds with Dr. Rahman over her diagnosis." DNP Donovan found Plaintiff was distraught; her mood was labile; her affect was anxious; her speech was pressured. Plaintiff was not responding to "any internal stimuli and there [were] no abnormal movements." Plaintiff exhibited no symptoms of psychosis, suicidality, or homicidality. DNP Donovan found Plaintiff's prognosis was "poor." She prescribed Cymbalta (R. 371-72).

Plaintiff reported to APRN Cuda on April 4, 2012, that she was medicating with Cymbalta and Neurontin and attending mental health counseling. Her blood pressure was 150/90 (R. 394). Plaintiff's musculoskeletal system examination was "normal." Her gait and stance were abnormal; she limped. APRN Cuda diagnosed benign essential hypertension (R. 395).

Dr. Cashell, of the Appalachian Community Health Center, met with Plaintiff to renew her prescriptions on May 31, 2012. Plaintiff reported she continued to experience depressive symptoms,

which related to her medical "problems." Plaintiff had no "definite plan for hurting herself and . . . her religion would not allow her to take any self-destructive action." Plaintiff stated she had significant financial and social stressors. Plaintiff had lived in a house with no running water since fall, 2011. Plaintiff reported a "slight improvement" of symptoms with Cymbalta and no adverse effects. Dr. Cashell noted Plaintiff was pleasant, cooperative, and anxious. She was not depressed, irritable, or delusional (R. 374). Dr. Cashell found Plaintiff's prognosis was fair and increased Plaintiff's dosage of Cymbalta (R. 375).

APRN Cuda examined Plaintiff relative to ear pain on May 31, 2012. He noted Plaintiff medicated with Cefdinir, Cymbalta, Hydrocodone, Klonopin, Neurontin, Ziac, and Zithromax. Plaintiff smoked daily. Her blood pressure was 110/80. She was oriented to time, place, person (R. 391). Her examination was normal (R. 391-92). APRN Cuda provided "[i]ntervention and counseling on cessation of tobacco use" to Plaintiff and diagnosed myalgia and myositis, depression, and anxiety disorder (R. 392).

DNP Donovan reviewed Plaintiff's medications with her on June 18, 2012. Plaintiff reported she had "done well on Cymbalta." She tolerated it well and it had "made an improvement in her life." Plaintiff was still "dealing" with housing issues, medical card issues, and disability. Plaintiff had no complaints; she requested that a different therapist be assigned to her. DNP Donovan found Plaintiff was pleasant, cooperative, in no acute distress, slightly downcast mood, and anxious. Her speech was normal. She was not responding to any internal stimuli. She had no psychosis or suicidal or homicidal ideations (R. 376). DNP Donovan found Plaintiff's prognosis was poor. She continued Plaintiff's prescription for Cymbalta (R. 377).

Plaintiff presented to Dr. High on September 13, 2012, for pain medication follow-up.

Plaintiff described her pain as throbbing, shooting, and burning. She experienced pain seventy-five (75) percent of the time. Pain was relieved by medication, worsened by exercise, and unchanged by standing, sitting, and walking. Plaintiff reported low back pain, which radiated down her right leg. Plaintiff reported leg weakness and a burning sensation in her right "leg or foot." Plaintiff had no dizziness. She had an abnormal gait (R. 388). Dr. High noted Plaintiff medicated with Cefdinir, Cymbalta, Gabapentin, Hydrocodone, Klonopin, Neurontin, Promethazine, Ziac, and Zithromax (R. 388). Plaintiff smoked daily. Her blood pressure was 130/74. Plaintiff reported her pain level was eight (8) on a scale of one-to-ten (1-10). Dr. High noted Plaintiff was in no acute distress. His examination of Plaintiff produced normal results, except she had back tenderness (R. 389-90). Her gait and stance were normal; her cranial nerves were normal. Plaintiff treated her transverse myelitis with eighteen (18) Hydrocodone pills per month (R. 390).

On September 26, 2012, DNP Donovan completed a Pharmacological Management assessment of Plaintiff. Plaintiff stated Cymbalta was "working well." Her sleep and appetite were fair. She had difficulty with morning stiffness because she had been "off pain meds." She did not "want to sign a pain contract with Dr. High." Plaintiff's life was affected by financial and situational stressors. DNP Donovan found Plaintiff was pleasant, cooperative, in no acute distress, and anxious. Plaintiff's speech was pressured; her affect and mood were congruent; she was not responding to any internal stimuli; she had no psychosis or suicidal or homicidal ideations. Plaintiff was assessed with anxiety disorder and major depressive disorder, recurrent (R. 378). DNP Donovan opined Plaintiff's prognosis was poor and instructed Plaintiff to continue medicating with Cymbalta and attend therapy (R. 379).

APRN Cuda completed a Physical Capacities Evaluation of Plaintiff on October 25, 2012.

He found Plaintiff could sit for two (2) hours in an eight (8) hour workday; she could stand and/or walk for one (1) hour in an eight (8) hour workday. APRN Cuda found Plaintiff had no manipulation limitations. He found Plaintiff could not use her feet for repetitive movements in operating pedal controls (R. 382). APRN Cuda found Plaintiff could frequently lift up to five (5) pounds. APRN Cuda found Plaintiff could occasionally lift and/or carry six (6) to ten (10) pounds and eleven (11) to twenty (20) pounds. APRN Cuda found Plaintiff could never lift between twenty-one (21) and one-hundred (100) pounds. APRN Cuda found Plaintiff could never climb, balance, crouch, or crawl. Plaintiff could occasionally stoop and kneel. Plaintiff could frequently reach above shoulder level. APRN Cuda found Plaintiff was severely restricted in exposure to unprotected heights; moderately restricted in being around moving machinery, to exposure to marked changes in temperature and humidity, and in driving automotive equipment. APRN Cuda found Plaintiff was positive for fatigue, which prevented her from working full time (R. 383). APRN Cuda found Plaintiff suffered from right leg neurologic pain, which was disabling and prevented her from working full time (R. 384). APRN Cuda opined that Plaintiff's pain and/or side effects of medication moderately affected Plaintiff's attention and concentration, which was "a significant handicap with sustained attention and concentration would eliminate skilled work tasks" (R. 385).

Administrative Hearing

Plaintiff testified she had lived with someone since July, when she was evicted from her apartment (R. 36). Plaintiff's car had broken down in January, 2010; she had not driven since. Plaintiff smoked one-half (½) package of cigarettes per day (R. 37). The ALJ noted that Plaintiff's medical providers advised her that she should not smoke; Plaintiff stated that "none of them's (sic) really said anything about my smoking." Plaintiff received food stamps (R. 39). She had a medical

card (R. 40). Plaintiff testified she was in prison for five (5) months in 2005 for a methamphetamine conspiracy conviction; she was released on supervised probation (R. 45, 49). After Plaintiff was released from prison, she participated in an AA program (R. 50). Plaintiff stated she had not attempted to be employed because she was not "capable to handle any of the responsibilities of any of them right now" (R. 46). Plaintiff testified that her "mental state" and "physical limitations" most affected her ability to work in that "[e]very aspect of [her] life has been affected by all of this" (R. 47). Plaintiff testified she had never had physical therapy, except at the "initial onset" of transverse myelitis (R. 48). Plaintiff medicated with Neurontin, Klonopin, "blood pressure pill," Cymbalta, and Ibuprofen (R. 48-49). Klonopin made Plaintiff "very, very drowsy" (R. 49).

Plaintiff testified she had to be "very careful whenever" she got in and out of the shower; she had to sit down to dress; she could not stand on one leg (R. 50). Plaintiff used a "free [cell] phone" with "free minutes"; she used it infrequently (R. 51). Plaintiff washed dishes by hand, did laundry once per week, did not vacuum, and took out the garbage (R. 52). Plaintiff cooked and shopped (R. 53). As to Plaintiff's activities, she stated she did "not [do] anything like a regular person does it right now" due to financial issues. Plaintiff did not "want to go out and do the things" she used to do due to mental health and physical issues (R. 54). Plaintiff testified her "emotion state" affected her because she was not able to provide for her son and she did not want to "subject him to anything he shouldn't have to deal with" (R. 55-56). Plaintiff testified she could not do her past work when she was "emotional or angry"; she could not concentrate; she could not "deal with people." It was "just too much; it's overwhelming" (R. 56). In describing her inability to work, Plaintiff stated she could not concentrate on job requests; she could not help coworkers; if one made a complaint, she'd have an "outburst"; when she had stressors, she became more anxious, upset, and everything got

21

"jumbled" (R. 56-57). Plaintiff had difficulty remembering what she'd read (R. 56).

The ALJ asked the VE the following hypothetical questions:

. . . [A]ssume a hypothetical individual of the same age, education and work experience as the claimant who retains the capacity to perform sedentary work with a sit/stand option allowing the person to briefly, for 1 to 2 minutes, alternating sitting or standing positions at 30-minute intervals without going off task; who is limited to no foot control operation bilaterally; who is limited to occasional posturals except no climbing or ladders, ropes or scaffolds.

Who must avoid concentrated exposure to extreme cold and heat; who must avoid concentrated exposure to wetness and humidity; who must avoid concentrated exposure to excessive vibration; who must avoid all exposure to unprotected heights, hazardous machinery and commercial driving.

Whose work is limited to simple, routine and repetitive tasks requiring only simple decisions with no fast-paced production requirements and few workplace changes. Must have no interaction with the public and only occasional interaction with co-workers and supervisors (R. 62).

The VE testified that Plaintiff's past work would not be available to such a hypothetical person; however, work as surveillance system monitor, document preparer, and ampoule sealer would be available (R. 62-63).

### III.  Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ LaVicka made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act at least through December 31, 2012. (Exhibit 3D).

2.  The claimant has not engaged in substantial gainful activity since April 1, 2011, the alleged onset date. (Exhibit 3D). (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3.  Since April 1, 2011, the claimant has had the following medically determinable impairments that, either individually or in combination, are "severe" and have significantly limited her ability to perform basic work activities for a period of at least 12 consecutive months: history of transverse

22

myelitis; right leg neurogenic muscle wasting; benign essential hypertension; "non-severe" hypothyroidism; anxiety disorder; depression; and "non-severe" personality disorder (20 CFR 404.1520(c) and 416.920(c)) (R. 11).

4.      Since April 1, 2011, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926) (R. 12).

5.      Since April 1, 2011, the claimant has had only the residual functional capacity to perform a range of work activity that: requires no more than a "sedentary" level of physical exertion; accommodates for a "sit/stand" option allowing to briefly for one to two minutes alternate sitting/standing at 30 minute intervals without going off task; limited to no foot control operation bilaterally; entails no climbing of ladders/ropes/scaffolds and no more than occasional performance of other postural activities; entails no concentrated exposure to temperature extremes, wet conditions, humid conditions, or excessive vibration; entails no exposure to unprotected heights, hazardous machinery, and commercial driving; entail only simple, routine and repetitive tasks requiring only simple decisions with no fast paced production requirements and few workplace changes; and entails no interaction with the general public and no more than occasional (sic) with co-workers and supervisors. (20 CFR 404.1567(a) and 416.967(a)) (R. 13-14).

6.      Since April 1, 2011, the claimant has been unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on July 13, 1973 and was 37 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. (Exhibits 3E, 9E, and 13E) (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English. (Exhibit 4E) (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)) (R. 22).

11.    The claimant has not been under a disability, at any time as defined in the
Social Security Act, from April 1, 2011, through the date of this decision (20
CFR 404.1520(g) and 416.920(g)) (R. 23).

## IV.  Discussion

### A.    Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to
determining whether "the findings of the Secretary are supported by substantial evidence and
whether the correct law was applied."  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).
Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a
conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v.
NLRB, 305 U.S. 197, 229 (1938)).  Elaborating on this definition, the Fourth Circuit has stated that
substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less
than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case
before a jury, then there is 'substantial evidence.'"  Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.
1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)).   In reviewing the
Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper
standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an
improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir.
1987).

### B.    Contentions of the Parties

Plaintiff contends that the ALJ "based his decision primarily on personal opinion."
(Plaintiff's Brief at 1.)   She also alleges that by advancing to the last step of the sequential
evaluation, she has "satisfied the criteria of an impairment that is severe enough" because "the expert

24

testified that after a few months a person with [her] 'issues' would lose the jobs that were noted."

(Id. at 2.) Plaintiff further asserts that the ALJ erred by finding her not credible based upon her usage of prescription medication because "credibility has nothing to do with the medication the Plaintiff was taking to minimize pain, especially since its been 2 ½ years since its been prescribed." (Id. at 2-3.) Finally, Plaintiff appears to argue that the ALJ erred by assigning more weight to the opinions of medical providers who did not "see or treat" her. (Id. at 3.)

The Commissioner contends that substantial evidence supports the ALJ's decision. (Defendant's Brief at 9-14.)

## C.    RFC

In her brief, Plaintiff states:

In my hearing transcript, not my denial letter, the expert testified that after a few months a person with my "issues" would lose the jobs that were noted, so a person could not perform those jobs if it were a known fact in ADVANCE that an employer would have no choice but terminate the employee, because of limitations. So technically those jobs do not exist if I would already know in a short time I wouldn't have it. Like I said if I advance to the last step, I have satisfied the criteria of an impairment that is severe enough.

(Plaintiff's Brief at 2.) The undersigned liberally construes Plaintiff's statement as an argument that the ALJ erred by not including limitations relative to unexcused absences or off-task work in his RFC formulation.

Under the Social Security Act, a claimant's RFC represents the most a claimant can do in a work setting despite the claimant's physical and mental limitations. 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1). "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis;" that is, for "8 hours a day, for 5 days a week, or an equivalent work schedule." Social Security Ruling ("SSR")

96-8p, 1996 WL 374184, at *1 (July 2, 1996). The Administration is required to assess a claimant's RFC based on "all the relevant evidence" in the case record. 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1). This assessment only includes the "functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms." SSR 96-8p, at *1. Even though the Administration is responsible for assessing RFC, the claimant has the burden of proving her RFC. See Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1993) (per curiam) (citing Grant v. Schweiker, 699 F.2d 189, 191 (4th Cir. 1983)) (claimant has the burden of production and proof through the fourth step of the sequential analysis); see also 20 C.F.R. §§ 404.1545(a)(3); 416.945(a)(3) (claimant is responsible for providing evidence to be used to develop RFC).

At the administrative hearing, the following colloquy occurred between the ALJ and the VE:

Q:    Regarding tolerances, what are the customary tolerances that a typical employer would have as to an employee being late to work of having unexcused absences, and if that were exceeded, what would the result be?

A:    It's my experience in working with employers that they will tolerate incidents of being late for work, to leave work early or miss an entire day and they will tolerate a maximum of two incidents a month before the individual may experience consequences regarding the incidents.

Q:    What are the customary number and lengths of breaks that the typical employer permits during the workday?

A:    Typically, employers provide for breaks of 15 minutes in the morning, 15 minutes in the afternoon and 30 minutes for lunch.

Q:    What are the customary tolerances for how much time during an eight-hour workday a typical employer would permit an employee to be off task in addition to regularly scheduled breaks, and if that were exceeded, what would the result be?

A:    There are studies that show that employees can be off task up to ten percent of a work period and still generally be able to maintain required levels of

productivity as required by employers. If an individual were off task more than ten percent on an ongoing basis, perhaps two to three months after getting the job, the individual would eventually lose the job.

(R. at 63-64.) Plaintiff appears to interpret the VE's testimony as a finding that she could not perform work in the jobs provided by the VE because of evidence that she would have unexcused absences and be off-task.

On April 29, 2011, Dr. Sharon Joseph completed a Psychological Evaluation of Plaintiff. Of particular note, Dr. Joseph found that Plaintiff was alert and oriented. (R. at 256.) Dr. Joseph further found that Plaintiff's concentration was normal. (R. at 257.) On July 1, 2011, Dr. Suansilppongse completed a Mental Functional Capacity Assessment and Psychiatric Review Technique of Plaintiff. In those, he found that Plaintiff had moderate limitations in maintaining concentration, persistence, or pace; and was moderately limited in completing a normal workday and workweek without interruptions from psychologically-based symptoms, and performing at a consistent pace without an unreasonable number and length of rest periods. (R. at 293, 301-02.) Dr. Suansilppongse concluded that Plaintiff's "ability for sustained concentration and persistence or for task completion would be minimally limited due to anxiety and depressive reaction, and alleged pain." (R. at 303.) Likewise, on September 5, 2011, Dr. Debra Lilly completed a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment of Plaintiff. In those, she found that Plaintiff had moderate limitations in maintaining concentration, persistence, and pace; and that she was moderately limited in her abilities to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, complete a normal workday and workweek without interruptions from psychologically-based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. (R. at 328, 332-33.)

27

At no time did Drs. Suansilppongse and Lilly find that Plaintiff would accumulate unexcused absences and be off task to the point where she could not sustain full-time work. Furthermore, at no time did any of Plaintiff's providers make similar findings. Given the lack of such evidence, the undersigned finds that Plaintiff did not meet her burden of production and proof. See Hunter, 993 F.2d at 35; see also 20 C.F.R. §§ 404.1545(a)(3); 416.945(a)(3). Accordingly, the ALJ did not err by not including limitations regarding unexcused absences and being off-task in his RFC.

**D.       Credibility**

Plaintiff argues that "credibility has nothing to do with the medication the Plaintiff was taking to minimize pain, especially since it's been 2 ½ years since it's been prescribed." (Plaintiff's Brief at 3.) Plaintiff further asserts that she went off those medications on her own in September 2012, and that they "were not helping a great deal" with her symptoms. (Id. at 2-3.) The Commissioner states that "the ALJ did not levy unfounded accusations; he simply and reasonably identified Plaintiff's actions regarding her medications as having affected his assessment of her credibility." (Defendant's Brief at 14.)

The ALJ has a "'duty of explanation'" when making determinations about credibility of the claimant's testimony." See Smith v. Heckler, 782 F.2d 1176, 1181 (4th Cir. 1986) (citing DeLoatche v. Heckler, 715 F.2d 148, 150-51 (4th Cir. 1983)); see also Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir. 1985). The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976)). This Court has noted that "[a]n ALJ's credibility determinations are 'virtually unreviewable.'" Ryan v. Astrue, No. 5:09CV55, 2011

WL 541125, at *3 (N.D. W. Va. Feb. 8, 2011) (Stamp, J.). If the ALJ meets his basic duty of explanation, "[w]e will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" Sencindiver v. Astrue, No. 3:08-CV-178, 2010 WL 446174, at *33 (N.D. W. Va. Feb. 3, 2010 (Seibert, Mag. J.) (quoting Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000)).

In Craig v. Chater, 76 F.3d 585 (4th Cir. 1996), the Fourth Circuit developed a two-step process for determining whether a person is disabled by pain or other symptoms. That process is as follows:

> First, there must be objective medical evidence showing "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and *which could reasonably be expected to produce the pain or other symptoms alleged.*" . . . Therefore, for pain to be found disabling, there *must* be show a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce" the actual pain, in the amount and degree, alleged by the claimant.
>
> . . .
>
> It is only *after* a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated. . . . Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings . . .; any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.) . . .; and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it . . . .

Id. at 594-95 (internal citations omitted). An ALJ "will not reject [a claimant's] statements about the intensity and persistence of . . . pain or other symptoms or about the effect [those] symptoms have on your ability to work . . . solely because the available objective medical evidence does not

substantiate your statements." 20 C.F.R. § 416.929(c)(2) (alterations in original).  Social Security

Ruling ("SSR") 96-7p sets out some of the factors used to assess the credibility of an individual's

subjective allegations of pain, including:

1.   The individual's daily activities;

2.   The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3.   Factors that precipitate and aggravate the symptoms;

4.   The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5.   Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6.   Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7.   Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996).  The determination or decision "must contain

specific enough reasons for the finding on credibility, supported by the evidence in the case record,

and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the

weight the adjudicator gave to the individual's statements and the reason for that weight."  Id. at *2.

As to Plaintiff's use of medication, the ALJ stated:

As a thorough assessment of the claimant's medical history is continued, the Administrative Law Judge notes that the claimant's credibility was again undermined by her actions in September 2012 and more additional noted improvement by her healthcare providers.  More specifically, on September 13, 2012, the claimant returned to Dr. High requesting pain medication.  On this date, although noting the claimant to have burning, throbbing, and shooting pain, and this practitioner reported that the claimant's symptoms were controlled on current medication.  Further, this practitioner reported the claimant to have leg weakness, gait abnormality, and a

burning sensation in the right leg or foot. However, upon examination, the claimant's gait and stance was reportedly normal. Dr. High noted that the claimant was receiving 18 hydrocodone tablets, but will continue this prescription provided that the claimant returned in the morning to provide a urine drug screen. (Exhibit 18F9-11). On September 26, 2012, the claimant reported to Ms. Donovan that her medication was working well, but complained of difficulty with morning stiffness since being off pain medications. Upon examination, the claimant's mood was anxious, but without signs of psychosis or suicidal/homicidal ideations. Despite the claimant's report that her medication was working well, Ms. Donovan again assessed the claimant with a poor prognosis. On this date, the claimant admitted that she did not want to sign a pain contract with Dr. High. (Exhibit 17F6-7). The undersigned concludes that one may reasonably surmise that an individual who has demonstrated long-term reliance upon addictive medications is more likely than not to report such ongoing symptoms as will facilitate continued obtainment of such medications, even in the absence of actual symptoms of such debilitating severity as would warrant the need for such medications. The Administrative Law Judge also is convinced that a medication-dependent/reliant individual is also unlikely to minimize, acknowledge or report such a decrease in the debilitating severity of symptoms as would result in a decrease in dosage or the discontinuation of highly addictive medications, even if such symptoms have actually subsided. Ongoing reliance upon such medications may also present a disincentive with regard to accepting any employment such as might: serve to contraindicate a continuing need for such addictive medications; fail to provide medical insurance coverage to enable continued obtainment of such addictive medications; or jeopardize ongoing or potential eligibility for public programs that otherwise provide medical insurance that facilitates obtainment of such addictive medications. The claimant's long-term opiate use may be fairly considered in evaluating the credibility of her related, subjective complaints.

(R. at 18-19.)

As the ALJ notes, Plaintiff saw Dr. High on September 13, 2012, for a follow-up regarding her pain medication. At that time, she told Dr. High that her pain was relieved by her medications. (R. at 388.) However, Plaintiff did not bring her bottles for her pain pill and Klonopin for Dr. High to check. (Id.) Dr. High noted that Plaintiff was receiving eighteen (18) hydrocodone tablets per month for her transverse myelitis; he stated that he would continue that prescription if she returned the following morning to provide a urine drug screen. (R. at 390.) Plaintiff never returned. Subsequently, on September 26, 2012, Plaintiff told DNP Donovan that she had difficulty with

morning stiffness because she had "been off pain meds." (R. at 378.) She told DNP Donovan that she "did not want to sign a pain contract with Dr. High." (Id.)

As noted above, "[t]he type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms" is one factor relevant to evaluating a claimant's symptoms, including pain. SSR 96-7p, 1996 WL 374186, at *3. "Evidence of drug seeking behavior is relevant to this inquiry." Elazzeh v. Astrue, No. 4:10-CV-00016-D, 2011 WL 780521, at *8 (E.D.N.C. Feb 10, 2011), adopted by 2011 WL 779785 (Feb. 28, 2011); see also Bagbey v. Colvin, No. 3:13CV298-HEH, 2014 WL 791871, at *11 (E.D. Va. Feb. 24, 2014) ("The ALJ reasonably used evidence of Plaintiff's drug-seeking behavior in making his credibility determination and substantial evidence supports his analysis."). In her brief, Plaintiff states that her medications "were not helping a great deal" with her symptoms. (Plaintiff's Brief at 3.) Such statement is inconsistent with the medical evidence set forth above, as Plaintiff told Dr. High, on September 13, 2012, that her medications relieved her pain. (R. at 388.) Given the evidence, the undersigned finds that the ALJ reasonably identified that Plaintiff's actions regarding her pain medication affected her credibility. Given this, the undersigned finds that Plaintiff's argument is without merit and should be denied.

## E.     Opinion Evidence

Plaintiff also states: "It was also noted that the ALJ believed Plaintiff to have more severe mentall [sic] limitations, than noted by physicians that treated, however, not seeing Plaintiff even walk across a room gives great weight to physicians whom didn't see or treat Plaintiff either." (Plaintiff's Brief at 3.) The undersigned liberally construes Plaintiff's statement as an argument that the ALJ erred by assigning less weight to the opinions given by her treating physicians than to

opinions provided by non-treating sources.

20 C.F.R. §§ 404.1527(c) and 416.927(c) state:

*How we weigh medical opinions.* Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion

(1) *Examining relationship.* Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) *Treatment relationship.* Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(I) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(I) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a

treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability.* The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) *Consistency.* Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) *Specialization.* We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) *Other factors.* When we consider how much weight to give a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

Likewise, 20 C.F.R. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I) provide:

Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. However, State agency medical or psychological consultants, or other program physicians or psychologists, are highly qualified physicians and psychologists who are also experts in Social Security disability evaluations. Therefore, administrative

law judges must consider findings of State agency medical or psychological consultants, or other program physicians or psychologists, as opinion evidence except for the ultimate determination about whether you are disabled.

"Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it." Craig v. Chater, 76 F. 3d 585, 589 (4th Cir. 1996). The treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Mitchell v. Schweiker, 699 F.2d 185, 187 (4th Cir. 1983). In Craig, however, the Fourth Circuit held:

> Circuit precedent does not require that a treating physician's testimony "be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,
>
>> [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.
>
> By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.

76 F.3d at 590. Furthermore, "[n]either the opinion of a treating physician nor the determination of another governmental entity are binding on the Secretary." DeLoatch v. Heckler, 715 F.2d 148, 150 n.1 (4th Cir. 1983).

The Fourth Circuit has also noted that a court "cannot determine if findings are supported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence." Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984). Indeed, "[u]nless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously

probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Arnold v. Sec'y of Health, Ed. & Welfare, 567 F.2d 258, 259 (4th Cir. 1977). The Administration has discussed the explanation of the weight to be given to a treating source's medical opinion, as follows:

> Paragraph (d)(2) of 20 CFR 404.1527 and 416.927 requires that the adjudicator will always give good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s), i.e., an opinion(s) on the nature and severity of an individual's impairment(s). Therefore:
>
> When the determination or decision:
>
> *is not fully favorable, e.g., is a denial; or
>
> *is fully favorable based in part on a treating source's medical opinion, e.g., when the adjudicator adopts a treating source's opinion about the individual's remaining ability to function;
>
> the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996). "[W]hen a physician offers specific restrictions or limitations . . . the ALJ must provide reasons for accepting or rejecting such opinions." Trimmer v. Astrue, No. 3:10CV639, 2011 WL 4589998, at *4 (E.D. Va. Sept. 27, 2011), aff'd by 2011 WL 4574365 (E.D. VA. Sept. 30, 2011). A logical nexus must exist between the weight accorded to opinion evidence and the record, and the reasons for assigning such weight must be "sufficiently articulated to permit meaningful judicial review." DeLoatch, 715 F.2d at 150.

As to the opinion evidence, the ALJ wrote:

In finding the above Residual Functional Capacity, the Administrative Law Judge has

thoroughly considered all medical opinions of record. On April 25, 2011, both Mr. Cuda and Dr. High opined that the claimant was not able to work full-time at customary occupation or like work due to emotional lability due to processing childhood sexual abuse. These practitioners further opined that the claimant was unable to perform other full time work. These practitioners also indicated that the claimant should avoid prolonged walking or standing. However, both practitioners recommended that the claimant should receive psychiatric counseling and treatment from a neurologist for muscle wasting. They further referred the claimant for vocational rehabilitation. (Exhibit 1F3-9). The undersigned has accorded limited weight to these conclusions by these practitioners. The undersigned believes that such findings are inconsistent with the above mentioned inconsistences and referenced medical evidence. Second, from examining the full record, these practitioners appear to have placed too great of weight on the claimant's subjective statements, and overstates her limitations. Finally, the Administrative Law Judge believes that these conclusions as to the claimant's limitations are overly severe and inconsistent with the full longitudinal record as discussed above including the frequent examinations and observations of the healthcare providers discussed above.

The undersigned has accorded little weight to the conclusions and observations provided by Mr. Cuda on December 2, 2011 and October 25, 2012. On December 2, 2011, Mr. Cuda opined that the claimant could only sit and stand/walk for one hour of an eight-hour day, respectively. This practitioner further reported that the claimant could not use both feet for repetitive movements for operating foot controls. Mr. Cuda also opined that the claimant could never lift and carry above five pounds and that the claimant's pain and fatigue from transverse myelitis and post-traumatic stress would prevent her from even working a full-time sedentary position. (Exhibit 13F1-4). On October 25, 2012, Mr. Cuda provided a medical source statement in which he opined that the claimant could only sit for two hours of a standard eight hour work day and stand/walk for only one hour for a standard eight hour work day. He further reported that the claimant could not use her right foot for repetitive movements in operating foot controls. This practitioner also opined that the claimant could only occasionally lift and carry up to twenty pounds along with other postural movements. Of course, these lifting capacities are inconsistent to those articulated by this practitioner on December 2, 2011. Mr. Cuda further opined that the claimant's fatigue and right leg neurologic pain was disabling to the extent that it prevented her from working full time, even in a sedentary position. Finally, Mr. Cuda reported that the claimant's pain and/or side effects of medication moderately affected the claimant's attention and concentration. (Exhibit 18F3-6). Much like his prior opinion joined by Dr. High, the undersigned has accorded limited weight to the claimant-friendly conclusions of Mr. Cuda. The undersigned believes that such findings are inconsistent with the above mentioned inconsistencies and referenced medical evidence. Second, from examining the full record, Mr. Cuda appears again to have placed too great of weight on the claimant's subjective statements, and overstates her limitations. Finally, the Administrative Law Judge believes that these

conclusions as to the claimant's limitations are overly severe and inconsistent with the full longitudinal record as discussed above including the frequent examinations and observations of the healthcare providers discussed above which are demonstrative of greater mental and physical functionality.

With regard to the opinions of the State Agency Medical Consultants, on July 1, 2011, Dr. Suansilppongse opined that the claimant was able to understand, remember, and carry out simple instructions. Further, this practitioner also noted that the claimant's ability for sustained concentration and persistence or for task completion would be minimally limited due to anxiety and depressive action, and alleged pain. Dr. Suansilppongse also reported that the claimant's ability for appropriate interaction with supervisors, coworkers or the public would not be significantly limited, and that the claimant's adaptability in a routine work setting would be minimally limited due to anxiety and depressive reaction. Overall, this practitioner concluded that the claimant had the "mental capacity for simple work related activity with minimal limitation due to alleged pain." (Exhibit 6F). On September 5, 2011, Dr. Lilly opined that the claimant would have only moderate limitations as to her "ability to perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerances," and her "ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." Finally, this practitioner opined that the claimant retained "the ability to learn, recall, and perform a variety of work-like activities in settings that do not have a high production demand." (Exhibit 10F). Under the circumstances and according any and all benefit of the doubt in the claimant's favor, the undersigned has accorded some weight to these findings by Drs. Suansilppongse and Lilly. Although in agreement with both practitioners on some of the claimant's mental limitations, the Administrative Law Judge has generously found the claimant to have greater mental health restrictions as articulated in the above Residual Functional Capacity. Ultimately, such limitations are found to be appropriate by the Administrative Law Judge in light of a full and thorough evaluation of the full longitudinal record.

With regard to medical opinions as to the claimant's physical condition, the Administrative Law Judge has accorded substantial weight to the State Agency Medical Consultant's assessments. (Exhibit 4F and 11F). It is noted that on June 23, 2011 State Agency Medical Consultant, Thomas Lauderman, D.O., assessed the claimant to have a "light" physical exertional capacity with other postural and environmental limitations. (Exhibit 4F). On September 9, 2011, State Agency Medical Consultant, Rogelio Lim, M.D., assessed the claimant to have a "light" physical exertional capacity with other postural and environmental limitations. (Exhibit 11F). The undersigned finds this assessment to be reasonably consistent with the full longitudinal record. In particular, the Administrative Law Judge finds this opinion to be balanced, objective, and consistent with the evidence of record as

a whole. Although Drs. Lauderman and Lim did not have an opportunity to examine or treat the claimant, their reports clearly reflect a thorough review of the record and are supportable including but not limited to the medical evidence thoroughly elaborated upon above. In short, these experts' familiarity with the SSA disability evaluation program and the evidence of record warrants the greatest weight. However, in light of the claimant's assertions and ambulation problems and in resolving any and all benefit of the doubt in her favor, the undersigned has ascribed for the above Residual Functional Capacity including but not limited to restricting the claimant to a "sedentary" physical exertional capacity.

(R. at 19-21.)

The ALJ properly noted that the opinion provided by APRN Cuda and Dr. High on April 25, 2011 was internally inconsistent. On that date, both practitioners opined that Plaintiff could not work full-time at her customary occupation or like work because Plaintiff was "processing sexual abuse in childhood–emotional lability." (R. at 240.) They also stated that Plaintiff was unable to perform other full-time work. (Id.) However, APRN Cuda and Dr. High agreed that Plaintiff should be referred for vocational rehabilitation. (R. at 241.) Finding that Plaintiff could not perform any full-time work is clearly inconsistent with a finding that she should be referred to vocational rehabilitation.

Furthermore, the opinion provided by APRN Cuda on December 2, 2011, is inconsistent with the one he provided on October 25, 2012. On December 2, 2011, APRN Cuda opined that Plaintiff could sit for one (1) hour in an eight (8)-hour workday, and that she could not use both of her feet to operate foot controls. (R. at 349.) He also stated that Plaintiff could occasionally lift and carry up to five (5) pounds and could never lift and carry anything above that. According to APRN Cuda on that date, Plaintiff also needed total restriction of activities involving unprotected heights, mild restriction of activities involving driving automotive equipment, and moderate restriction of activities involving exposure to dust, fumes, and gases. APRN Cuda further opined that Plaintiff

could never stoop, kneel, and crouch; but could occasionally climb, balance, crawl, and reach above shoulder level. (R. at 350.) However, on October 25, 2012, APRN Cuda found that Plaintiff could sit for two (2) hours in an eight (8)-hour workday, and that she could use her left foot to operate foot controls. (R. at 382.) He also opined that Plaintiff could frequently lift and carry up to five (5) pounds, and occasionally lift and carry up to twenty (20) pounds. APRN Cuda further found that Plaintiff could never climb, balance, crouch, or crawl; could occasionally stoop and kneel; and could frequently reach above shoulder level. Finally, he found that Plaintiff needed severe restriction of activities involving unprotected heights; moderate restriction of activities involving driving automotive equipment; and no restrictions on exposure to dust, fumes, and gases. (R. at 383.) Given these inconsistencies, the ALJ appropriately assigned "little" and "limited" weight to these opinions.

Furthermore, APRN Cuda did not even explain his rationale for finding such extreme limitations as noted above. See 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) ("The better an explanation a source provides for an opinion, the more weight we will give that opinion."). His failure to do so is glaring, considering that the ALJ properly noted that APRN Cuda's opinions were inconsistent with the longitudinal record, including his own treatment notes. For example, on November 22, 2010, APRN Cuda noted that Plaintiff's examination was normal except for a "slight" limp. (R. at 248.) Plaintiff's examination on March 22, 2011 was normal. (R. at 246.) On April 25, 2011, APRN Cuda noted a normal examination, with the exception of Plaintiff's right calf being smaller than her left. (R. at 244.) Four days later, on April 29, 2011, Dr. Joseph observed that Plaintiff had no "obvious" physical limitations. (R. at 256.) On July 26, 2011, APRN Cuda noted that, except for a limp on her right side, Plaintiff's examination was normal. (R. at 306.) Plaintiff had another normal examination with APRN Cuda on December 2, 2011. (R. at 353-54.) APRN

Cuda noted a normal musculoskeletal examination on April 4, 2012 (R. at 395), and another normal examination on May 31, 2012 (R. at 391-92). Finally, on September 13, 2012, Dr. High noted that, except for back tenderness, Plaintiff's examination was normal. She also had a normal gait, stance, and cranial nerves. (R. at 389-90.)

Furthermore, APRN Cuda's opinions were inconsistent with the evaluation of Plaintiff that Dr. Rahman completed on December 8, 2011. Plaintiff's skin, cardiac, neurological, chest, and abdominal examinations were normal. Plaintiff's motor examination showed normal muscle tone and bulk; she had mild atrophy. Dr. Rahman found that Plaintiff had weakness of the right leg, hip flexion and extension, abduction and aduction, and knee flexion and extension. Her strength was normal in her left leg and both arms. Plaintiff's deep tendon reflexes were bilaterally active; her right leg was hyperactive. Plaintiff's gait was positive for a limp. (R. at 358.) On March 20, 2012, Dr. Rahman noted right leg numbness. (R. at 360-61.) However, at no time did Dr. Rahman opine that Plaintiff had the extreme physical limitations as set forth by APRN Cuda.

APRN Cuda's opinions were also inconsistent with those provided by the State agency physicians. On June 23, 2011, Dr. Lauderman completed a Physical Residual Functional Capacity Assessment of Plaintiff. In that, he found that Plaintiff could occasionally lift and carry twenty (20) pounds; frequently lift and carry ten (10) pounds; stand, walk, and sit for six (6) hours in an eight (8)-hour workday; and had no restrictions on pushing and pulling. (R. at 276.) He found that Plaintiff could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; she could never climb ropes, ladders, or scaffolds. (R. at 277.) Plaintiff needed to avoid concentrated exposure to extreme cold, heat, and vibration; and needed to avoid all exposure to hazards. (R. at 279.) On September 9, 2011, Dr. Lim completed a Physical Residual Functional Capacity

41

Assessment of Plaintiff. He found that Plaintiff could occasionally lift and carry twenty (20) pounds; frequently lift and carry ten (10) pounds; stand, walk, and sit for six (6) hours in an eight (8)-hour workday; and had no limitations with pushing and pulling. (R. at 337.) Plaintiff could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; she could never climb ladders, ropes, or scaffolds. (R. at 338.) Dr. Lim found that Plaintiff should avoid concentrated exposure to extreme cold and vibration and all exposure to hazards. (R. at 340.)

In sum, the ALJ appropriately assigned "limited" and "little" weight to the opinions given by APRN Cuda. Not only was the opinion provided by APRN Cuda and Dr. High on April 25, 2011, internally inconsistent, but the opinion provided by APRN Cuda on December 2, 2011, was inconsistent with the one he provided on October 25, 2012. Furthermore, his opinions were inconsistent with the longitudinal record, including his own treatment notes. Given this, the undersigned finds that Plaintiff's argument is without merit and should be denied.

## V. RECOMMENDATION

For the reasons herein stated, I find substantial evidence supports the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI. I accordingly recommend Defendant's Motion for Summary Judgment be **GRANTED,** and the Plaintiff's Motion for Summary Judgment be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will

result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984), <u>cert. denied</u>, 467 U.S. 1208 (1984); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).

The Clerk of the Court is directed to provide an electronic copy of this Report and Recommendation to counsel of record and to mal a copy to the *pro se* Plaintiff by certified mail, return receipt requested.

Respectfully submitted this _23_ day of *March* , 2015.


JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE