```
IN THE UNITED STATES DISTRICT COURT
   FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
```

**TINA MONROE,**

     **Plaintiff,**

**v.**                                      **CIVIL ACTION NO. 1:14CV48**
                                                      **(Judge Keeley)**

**COMMISSIONER OF SOCIAL SECURITY,**

     **Defendant.**

### ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION/OPINION

This case is pending for consideration of the Report and Recommendation of United States Magistrate Judge John S. Kaull (dkt. no. 30). For the reasons that follow, the Court adopts Magistrate Judge Kaull's Report and Recommendation, grants the Commissioner's motion for summary judgment, denies Monroe's summary judgment motion, and dismisses this case from the active docket of this Court.

### I. PROCEDURAL BACKGROUND

Pursuant to this Court's Local Rules, the Court previously referred this action to Magistrate Judge Kaull on March 21, 2014 for submission of a proposed report and recommendation ("R&R"). Magistrate Judge Kaull filed his R&R on March 24, 2015, in which he recommended that the Court grant the Commissioner's motion for summary judgment (dkt. no. 28), and deny the pro se plaintiff, Tina Monroe's, ("Monroe"), motion for summary judgment (dkt. no. 24). On April 14, 2015, Monroe timely filed objections to the R&R (dkt. no.

32). The Commissioner responded to Monroe's objections on April 24, 2015, (dkt. no. 33).

## II. CASE HISTORY

On April 28 and 30, 2011, Monroe filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), alleging disability since April 1, 2011, due to depression, post traumatic stress disorder ("PTSD"), anxiety, transverse myelitis, and high blood pressure (R. 9, 139-43, 197). The Commissioner denied the applications initially and upon reconsideration (R. 67-70).

On November 30, 2012, an Administrative Law Judge ("ALJ") conducted a hearing at which Monroe, represented by a non-attorney representative, appeared and testified. An impartial Vocational Expert ("VE") also testified. For purposes of its review, the Court incorporates the testimonial evidence presented at the hearing found in the record on pages 29 through 66.

On December 5, 2012, the ALJ determined Monroe was not disabled (R. 9-23). Using the five-step evaluation process described in 20 C.F.R. §§ 404.1520 and 416.920, the ALJ concluded:

    1.    The claimant meets the insured status requirements of the Social Security Act at least through December 31, 2012. (Exhibit 3D);

2. The claimant has not engaged in substantial gainful activity since April 1, 2011, the alleged onset date. (Exhibit 3D). (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*);

3. Since April 1, 2011, the claimant has had the following medically determinable impairments that, either individually or in combination, are "severe" and have significantly limited her ability to perform basic work activities for a period of at least 12 consecutive months: history of transverse myelitis; right leg neurogenic muscle wasting; benign essential hypertension; "non-severe" hypothyroidism; anxiety disorder; depression; and "non-severe" personality disorder (20 CFR 404.1520(c) and 416.920(c)) (R. 11);

4. Since April 1, 2011, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926) (R. 12);

5. Since April 1, 2011, the claimant has had only the residual functional capacity to perform a range of work activity that: requires no more than a "sedentary" level of physical exertion; accommodates for a "sit/stand" option allowing to briefly for one to two minutes alternate sitting/standing at 30 minute intervals without going off task; limited to no foot control operation bilaterally; entails no climbing of ladders/ropes/scaffolds and no more than occasional performance of other postural activities; entails no concentrated exposure to temperature extremes, wet conditions, humid conditions, or excessive vibration; entails no exposure to unprotected heights, hazardous machinery, and commercial driving; entails only simple, routine and repetitive tasks requiring only simple decisions

      with no fast paced production requirements and few workplace changes; and entails no interaction with the general public and no more than occasional (sic) with co-workers and supervisors. (20 CFR 404.1567(a) and 416.967(a)) (R. 13-14);

6. Since April 1, 2011, the claimant has been unable to perform any past relevant work (20 CFR 404.1565 and 416.965);

7. The claimant was born on July 13, 1973 and was 37 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. (Exhibits 3E, 9E, and 13E) (20 CFR 404.1563 and 416.963);

8. The claimant has at least a high school education and is able to communicate in English. (Exhibit 4E) (20 CFR 404.1564 and 416.964);

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2);

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)) (R. 22); and

11. The claimant has not been under a disability, at any time as defined in the Social Security Act, from April 1, 2011, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)) (R. 23).

(R. 9-23).

On January 23, 2014, the Appeals Council denied Monroe's request for review, making the ALJ's decision the final decision of the Commissioner (R. 1-4). On March 21, 2014, Monroe timely filed this civil action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of the Social Security Administration denying her claim (dkt. no. 1).

### III. STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court must conduct a *de novo* review of any portion of the magistrate judge's recommendation to which objection is timely made. As to those portions of a recommendation to which no objection is made, a magistrate judge's findings and recommendation will be upheld unless they are "clearly erroneous." See Webb v. Califano, 458 F. Supp. 825 (E.D. Cal. 1979). Because Monroe filed objections, this Court will undertake a *de novo* review of the portions of the R&R to which she has objected.

An ALJ's findings will be upheld if supported by substantial evidence. See Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). Substantial evidence is that which a "reasonable mind might accept as adequate to support a conclusion." Hays v.

Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). Further, the "possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." Sec'y of Labor v. Mutual Mining, Inc. 80 F.3d 110, 113, (4th Cir. 1996) (quoting Conolo . Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966)).

## IV.  DISCUSSION

Monroe's "Motion to File Objection" contained two objections to the magistrate judge's R&R. First, Monroe contends that the ALJ's credibility analysis failed to address the pain caused by her transverse myelitis. She argues that "throughout this whole ordeal, my history of transverse myelitis has not been addressed and since it is a 'rare' autoimmune disorder it needs to be." (Dkt. No. 32 at 1). Next, Monroe contends that she is not responsible for any inconsistencies in the reports of the doctors (dkt. no. 32 at 3).

The Commissioner argues that the ALJ's "lengthy, detailed and (at a minimum) reasonable analysis of all of the evidence of record" included Monroe's history of transverse myelitis "among her severe impairments" (dkt. no. 33 at 1) and supported the ALJ's Residual Functional Capacity ("RFC") assessment. The Commissioner

also contends that the RFC included all the limitations established by the record, and ultimately assigned a more significant limitation than the one recommended by the state-agency expert physicians (dkt. no. 33 at 2).

## A. Credibility

Turning first to Monroe's argument that the ALJ failed to address the pain she experiences from transverse myelitis, in support of her objection, she attached an article about transverse myelitis and its effects from the United States Department of Health and Human Services, Public Health Service, National Institute of Health.[1] (Dkt. No. 32). The magistrate judge noted that an ALJ has a "'duty of explanation'" when making determinations about credibility of the claimant's testimony." See Smith v. Heckler, 782 F.2d 1176, 1181 (4th Cir. 1986) (citing DeLoatche v. Heckler, 715 F.2d 148, 150-51 (4th Cir. 1983)); see also Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir. 1985).

The Fourth Circuit, moreover, has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the

---

[1] Interestingly, this article states that "[t]he majority of people with this disorder experience only one episode although in rare cases recurrent or relapsing transverse myelitis does occur." (Dkt. No. 32-1 at 13).

7

credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976)). This Court also has noted that "[a]n ALJ's credibility determinations are 'virtually unreviewable.'" Ryan v. Astrue, No. 5:09CV55, 2011 WL 541125, at *3 (N.D. W. Va. Feb. 8, 2011) (Stamp, J.). Thus, if the ALJ meets his basic duty of explanation, "[w]e will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" Sencindiver v. Astrue, No. 3:08-CV-178, 2010 WL 446174, at *33 (N.D. W. Va. Feb. 3, 2010 (Seibert, Mag. J.) (quoting Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000)).

Here, the ALJ first determined that Monroe had satisfied the two prongs of Craig v. Chater, 76 F.3d 585 (4th Cir. 1996), finding that her medically determinable impairments could reasonably be expected to produce the symptoms she alleged. He then found however that Monroe's statements concerning the intensity, persistence and limiting effects of the symptoms were not entirely credible.

Following a thorough evaluation of the medical evidence of record, the ALJ stated:

8

> The treatment history and medical evidence of record is not indicative of a disabling condition which would render the claimant unable to engage in all forms of sustained employment fo a continuous period of 12 months. In particular, the claimant presents with an inconsistent treatment history with some periods of medical improvement which contraindicate the presence of a totally disabling condition for a continuous period of 12 months. The extensive inconsistencies in the treatment history are not suggestive of the presence of such persistently debilitating symptoms as have been alleged by the claimant for a period of 12 continuous months.

(R. 16).

### 1.

In making this determination, the ALJ specifically considered the following medical evidence in his analysis:

1. A November 22, 2010, note from Francis Cuda, APRN, ("APRN Cuda"), indicating that Monroe's examination was normal except for a "slight" limp. Her medications were Klonopin, Requip and Keflex. (R. 248);

2. A March 22, 2011, note from APRN Cuda, indicating Monroe complained of not sleeping well because of startling and legs moving. Her medications were Celexa, Hydrocodone, Acetaminophen, Klonopin, and ZIAC. (R. 246);

3. An April 25, 2011, note from APRN Cuda, indicating a normal examination, with the exception of Monroe's right calf being smaller than her left. (R. 244). Also on April 25, 2011, APRN Cuda and D.S. High, M.D. ("Dr. High") completed a State of West Virginia Department of Health and Human Resources Medical Review Team Medical Information/Diagnostic Request indicating Monroe could not work full-time at her customary occupation or like work due to "processing sexual abuse in childhood-emotional lability" and was unable to perform

   other full-time work. Despite this, they agreed that Monroe should be referred for vocational rehabilitation. (R. 238-41);

4. An April 29, 2011, psychological evaluation from Dr. Sharon Joseph ("Dr. Joseph"), indicting Monroe reported a diagnosis of transverse Myelitis and paralysis at age 14. The report further indicates that Monroe could wash dishes, dust, clean the bathroom, put away groceries, go up and down stairs, take out the garbage, walk to the mailbox, go grocery shopping and drive a car. On examination, Dr. Joseph noted no "obvious" physical limitations. (R. 255-59);

5. A July 26, 2011, note from APRN Cuda, indicating that, except for a limp on her right side, Monroe's examination was normal. (R. 306);

6. A December 2, 2011, Physical Capacities Evaluation from APRN Cuda, indicating Monroe could sit, stand, and/or walk for one (1) hour in an eight (8) hour workday, needed to alternate between standing and sitting at will, had no manipulative limitations, could not use her feet to operate pedals, could occasionally lift and/or carry up to five (5) pounds in an eight (8) hour workday, could never lift and/or carry six (6) to one-hundred (100) pounds in an eight (8) hour workday, could occasionally climb, balance, crawl, and reach above shoulder level in an eight (8) hour workday, could never stoop, kneel, or crouch in an eight (8) hour workday, was totally restricted from activities involving unprotected heights, was moderately restricted in activities involving moving machinery, marked changes in temperature and humidity, and exposure to dust, fumes, and gases, and was mildly restricted in activities involving driving automotive equipment (R. 349-50). APRN Cuda further opined that the pain caused by her transverse myelitis prevented her from being employed on a full-time basis (R. 351);

7. A December 8, 2011, note from an evaluation by Dr. Rahman for pain, numbness, and weakness in her right leg. Monroe

        reported a hospitalization in 1987 for two (2) weeks for right leg pain, weakness, and numbness and had been "suspected" of having transverse myelitis (R. 357). Dr. Rahman opined the "etiology was uncertain" and needed "to be considered" (R. 358);

8. A September 13, 2012, note from Dr. High from a pain medication follow-up appointment, indicting Monroe reported throbbing, shooting, and burning pain seventy-five (75) percent of the time that was an eight on a scale of one to ten. She further reported that medication relieved the pain, that exercise caused the pain to worsen, and that her pain remained unchanged while standing, sitting, and walking. She reported low back pain that radiated down her right leg, leg weakness and a burning sensation in her right "leg or foot," and no dizziness. Her medications included Cefdinir, Cymbalta, Gabapentin, Hydrocodone, Klonopin, Neurontin, Promethazine, Ziac, and Zithromax (R. 388). On examination, despite her report of leg weakness, gait abnormality, and a burning sensation in the right leg or foot, her gait and stance were normal. Dr. High noted that Monroe treated her transverse myelitis with eighteen (18) Hydrocodone pills per month. Significantly, during this evaluation, Dr. High agreed to continue Monroe's prescription for eighteen (18) hydrocodone tablets on the condition that she return the next morning for a urine drug screen. Monroe, however, failed to return for the drug screen ((R. 389-90, R. 19);

9. A September 26, 2012, report from Carolyn Donovan, DNP, PMHCNS-BC, FNP-C, indicating Monroe "did not want to sign a pain contract with Dr. High" and that she was having difficulty with morning stiffness because she had "been off pain meds." (R. 378); and

10. An October 25, 2012, note from APRN Cuda, indicting Monroe could sit for two (2) hours in an eight (8)-hour workday, could use her left foot to operate foot controls, could frequently lift and carry up to five (5) pounds, occasionally lift and carry up to twenty (20)

pounds, could never climb, balance, crouch, or crawl, could occasionally stoop and kneel, could frequently reach above shoulder level, needed severe restriction of activities involving unprotected heights, moderate restriction of activities involving driving automotive equipment, and no restrictions on exposure to dust, fumes, and gases. (R. 382-83).

In addition to these medical records, the ALJ reviewed the State Agency Medical Consultant's assessments (R. 20-1), including:

1. A June 23, 2011, Physical Residual Functional Capacity Assessment from Dr. Lauderman indicating Monroe could occasionally lift and carry twenty (20) pounds, frequently lift and carry ten (10) pounds, stand, walk, and sit for six (6) hours in an eight (8)-hour workday, had no restrictions on pushing and pulling, could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, could never climb ropes, ladders, or scaffolds, must avoid concentrated exposure to extreme cold, heat, and vibration, and all exposure to hazards, and indicating Monroe retained the ability to perform work at a "light" physical exertional capacity with other postural and environmental limitations (R. 276-9); and

2. A September 9, 2011, Physical Residual Functional Capacity Assessment from Rogelio Lim, M.D., indicating Monroe could occasionally lift and carry twenty (20) pounds, frequently lift and carry ten (10) pounds, stand, walk, and sit for six (6) hours in an eight (8)-hour workday, had no limitations with pushing and pulling, could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, could never climb ladders, ropes, or scaffolds, should avoid concentrated exposure to extreme cold and vibration and all exposure to hazards, and indicating Monroe retained the ability to perform work at a "light" physical exertional capacity with other postural and environmental limitations. (R. 337-40).

Following his review of Monroe's statements regarding the pain she experienced and the inconsistencies in the medical reports, as thoroughly discussed on pages 15 through 19 of the record, the ALJ made the following finding regarding Monroe's credibility:

> For all the foregoing reasons and in view of the evidence cited, the Administrative Law Judge does not find the claimant to be entirely credible and does not fully accept the claimant's subjective statements concerning her symptoms and limitations, as purported to exist throughout the period at issue herein. The claimant has medically determinable impairments that could reasonable be expected to cause some of the symptoms described, and the undersigned believes that the claimant does experience symptoms related to such impairments, but not to the frequency or debilitating degree of severity alleged. In view of this determination concerning the claimant's credibility, the Administrative Law Judge does not accept medical findings or opinions that are based solely or primarily upon the claimant's subjective complaints.

(R. 19).

**2.**

An ALJ must determine a claimant's residual functional capacity ("RFC"), defined as a claimant's ability to do physical and mental work activities on a sustained basis despite the limitations from their impairments. 20 C.F.R. 404.1520(e) and 416.920(e). Here, the ALJ determined that Monroe's treatment

history and her ability to perform some daily activities failed to demonstrate a totally disabling condition. (R. 21).

> Since April 1, 2011, the claimant has had only the residual functional capacity to perform a range of work activity that: requires no more than a "sedentary" level of physical exertion; accommodates for a "sit/stand" option allowing to briefly for one to two minutes alternate sitting/standing at 30 minute intervals without going off task; limited to no foot control operation bilaterally; entails no climbing of ladders/ropes/scaffolds and no more than occasional performance of other postural activities; entails no concentrated exposure to temperature extremes, wet conditions, humid conditions, or excessive vibration; entails no exposure to unprotected heights, hazardous machinery, and commercial driving; entail only simple, routine and repetitive tasks requiring only simple decisions with no fast paced production requirements and few workplace changes; and entails no interaction with the general public and no more than occasional (sic) with co-workers and supervisors. (20 CFR 404.1567(a) and 416.967(a)) (R. 13-14).

Moreover,

> . . . the above Residual Functional Capacity sufficiently accommodates for any ambulatory limitations experienced by the claimant with the physical restrictions articulated above including but not limited to a sedentary physical exertional capacity and the 'sit/stand' option elaborated above. Therefore, the Administrative Law Judge believes that the claimant has remained essentially capable of performing at least such limited range of work as has been defined within the parameters above.

(R. 22).

**3.**

Based on the ALJ's thorough review and analysis regarding Monroe's statements regarding her pain and its limitations, and the evidence of record, the magistrate judge found that the evidence of record supports the ALJ's conclusion that Monroe's statements regarding her pain and its limitations were not entirely credible, that the reports of APRN Cuda and Dr. High overstated the limitations she reported, and that the limitations contained in their reports were "overly severe and inconsistent with the full longitudinal record" (R&R 28-32). Accordingly, the Court finds that the magistrate judge correctly adopted the ALJ's credibility analysis and, therefore, **OVERRULES** the objection.

### B. Inconsistencies in the Medical Evidence

Monroe has further objected that the inconsistencies in the medical reports should not be held against her. 20 C.F.R. § 404.1527 provides that an ALJ will weigh and evaluate every medical opinion in the record utilizing the following factors to determine what weight to assign a medical opinion: examining relationship; treatment relationship; length of the treatment relationship; frequency of examination; nature and extent of the treatment relationship; supportability; and consistency.

"Although it is not binding on the Commissioner, a treating

15

physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it." Craig v. Chater, 76 F. 3d 585, 589 (4th Cir. 1996). The treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Mitchell v. Schweiker, 699 F.2d 185, 187 (4th Cir. 1983).

In Craig, however, the Fourth Circuit held:

Circuit precedent does not require that a treating physician's testimony 'be given controlling weight.' Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,

> [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.

76 F.3d at 590. Moreover, "[n]either the opinion of a treating physician nor the determination of another governmental entity are

binding on the Secretary." DeLoatch v. Heckler, 715 F.2d 148, 150 n.1 (4th Cir. 1983).

In the Fourth Circuit, a court "cannot determine if findings are supported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence." Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984). Indeed, "[u]nless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Arnold v. Sec'y of Health, Ed. & Welfare, 567 F.2d 258, 259 (4th Cir. 1977).

"[W]hen a physician offers specific restrictions or limitations . . . the ALJ must provide reasons for accepting or rejecting such opinions." Trimmer v. Astrue, No. 3:10CV639, 2011 WL 4589998, at *4 (E.D. Va. Sept. 27, 2011), aff'd by 2011 WL 4574365 (E.D. VA. Sept. 30, 2011). A logical nexus must exist between the weight accorded to opinion evidence and the record, and the reasons for assigning such weight must be "sufficiently

articulated to permit meaningful judicial review." DeLoatch, 715 F.2d at 150.

Here, the ALJ accorded limited weight to the conclusions of Francis Cuda, APRN ("APRN Cuda), and D.S. High, M.D. ("Dr. High") due to the inconsistencies between their reports and the medical evidence of record. As noted above, the ALJ stated that APRN Cuda and Dr. High "appeared to have placed too great a weight on Monroe's subjective statements which he believed overstated her limitations" and were "overly severe and inconsistent with the full longitudinal record." (R. 20).

With regard to the inconsistencies between the limitations noted by APRN Cuda and Dr. High and the medical evidence of record, the ALJ specifically, considered the medical evidence noted above on pages 9 through 12. He then assigned less weight to the opinions of APRN Cuda and Dr. High due to their inconsistency with other evidence in the full longitudinal record. Although he noted that Drs. Lauderman and Lim had not examined Monroe, he found that their reports were balanced, objective, and consistent with the evidence of record as a whole, and were supported by the medical evidence of record in light of their familiarity with the SSA disability evaluation program. (R. 21). Significantly, while Drs. Lauderman

18

MONROE V. COMMISSIONER OF SOCIAL SECURITY                    1:14CV48

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

and Lim found Monroe's physical limitation to be "light", the ALJ assigned Monroe a "sedentary" physical exertional capacity "in light of the claimant's assertions and ambulation problems and in resolving any and all benefits of the doubt in her favor." (R. 19-21).

The magistrate judge found that the ALJ had considered all of the medical evidence and, noting the inconsistencies between the reports from APRN Cuda and Dr. High and the other evidence of record, had assigned proper weight to the reports of APRN Cuda and Dr. High. Accordingly, the magistrate judge determined that the record provides substantial evidence to support the ALJ's determination that Monroe retains the ability to perform work at a "sedentary" level of exertion. Therefore, the Court **OVERRULES** Monroe's objection to the magistrate judge's R&R.

## V. CONCLUSION

Upon careful review of the above, for the reasons stated, the Court **ADOPTS** the magistrate judge's R&R. Further, the Court **OVERRULES** Monroe's objections.

The Court therefore **ORDERS** that Magistrate Judge Kaull's R&R is accepted in whole and this civil action be disposed of in

accordance with the recommendation of the Magistrate Judge. Accordingly, the Court

1. **GRANTS** the defendant's motion for Summary Judgment (Dkt. No. 28);

2. **DENIES** the plaintiff's motion for Summary Judgment (Dkt. No. 24); and

3. **DISMISSES** this civil action **WITH PREJUDICE** and **DIRECTS** that it be **STRICKEN** from the active docket of this Court.

Pursuant to Fed.R.Civ.P. 58, the Court directs the Clerk of Court to enter a separate judgment order and to transmit copies of this Order to counsel of record.

It is so **ORDERED**.

DATED: July 22, 2015.

/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE